FILED

KL

2/15/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

RECEIVED

LK

2/14/2022

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

VIVEK SHAH,
      Plaintiff,

v.

PAYPAL, INC., and DANIEL H.
SCHULMAN,
      Defendants.

Civil Action No. **1:22-CV-00795**

JUDGE NORGLE
MAGISTRATE JUDGE HARJANI
RANDOM

## VERIFIED COMPLAINT

### DEMAND FOR JURY TRIAL

Plaintiff VIVEK SHAH alleges for his Verified Complaint against Defendants PAYPAL,

INC. and DANIEL H. SCHULMAN, based upon personal knowledge as to himself and his own

acts and experiences, and, as to other matters, upon information and belief, as follows:

### PRELIMINARY STATEMENT

1.      If it looks like a duck, swims like a duck, and quacks like a duck, then it probably

is **a duck**.

2.      To receive deposits in the United States, a bank must be chartered or be given

permission to operate by the federal or a state government. 12 U.S.C. § 378(a)(2). For over two

decades, Defendant PayPal, Inc. ("PayPal") has been engaging in unlawful taking of deposits by

an entity not regulated as a bank and that it, in essence, was illegally operating as an unlicensed

bank in violation of the criminal provisions of the Glass-Steagall Act. The transmission of such

criminally derived deposits, in turn, violate 18 U.S.C. §§ 1956(c)(3)(A) and 1960(a), since

PayPal is an unlicensed money transmitting business, as defined by the federal law; violations of

which form the predicate acts of racketeering activity under the Racketeering Influenced and

Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 et seq.

1

3.      This action stems from Defendants' widespread business practice of unilaterally seizing funds from its clients' financial accounts, without cause and without any fair or due process.

4.      PayPal places a "hold" on Plaintiff's own funds in his own PayPal account. PayPal has failed to inform him of the reason(s) for the actions it has taken and denying Plaintiff access to his own money.

5.      PayPal excuses its unlawful seizure based on an alleged violation of its Acceptable Use Policy ("AUP")[1] without stating in what way Plaintiff's use of his PayPal account violates the AUP.

6.      PayPal's application of an unlawful and unenforceable liquidated damages clause, which is a contract of adhesion, without any causal connection to any damages PayPal actually suffered, as a justification for its wholesale seizure of the entire balance of Plaintiff's PayPal account, and transferring said balance to PayPal's own account, for PayPal's own use, is inequitable and unconscionable, amounting to nothing less than a conversion of funds which do not belong to PayPal. Moreover, PayPal then blatantly invests the money and earns interest on it.

7.      Defendants operate the immensely popular PayPal online payment platform. As part of this platform, users such as Plaintiff maintain account balances which includes funds the users have deposited into the PayPal platform as well as money sent to the users by customers and other users. These funds belong to the users, not Defendants.

8.      Nevertheless, Defendants have adopted a business practice of unilaterally seizing some or all of its users' funds when Defendants merely suspect the user in question violated

---

[1] https://www.paypal.com/us/webapps/mpp/ua/acceptableuse-full

Defendants' AUP, which is a set of restrictions Defendants place on certain transactions made through the PayPal platform.

9.      Upon information and belief, Defendants seizes these funds without first obtaining any conclusive determination of actual breaches by the users of the AUP – indeed, Defendants do so without even conducting a reasonable investigation to determine whether any violation occurred.

10.     Rather, Defendants have adopted a business policy of "shooting first and asking questions later" – taking the money for itself and only afterwards, and occasionally, interacting with the users to determine whether the seizure was appropriate.

11.     Moreover, the amounts that Defendants seize bear no relationship to any actual damages suffered by them. Rather, Defendants arbitrarily seize amounts based on a liquidated damages provision buried in their User Agreement which has no connection to the actual damages suffered by them – indeed, which is often used where Defendants have suffered no damages whatsoever.

12.     The Agreement requires PayPal to, at a minimum, provide notice to such users of any hold placed on their accounts that includes both the reason for the hold and an opportunity to request restoration of access to the held funds. PayPal's "notice" falls far short of what is required. As a result, Plaintiff has no idea why his money was "held" by PayPal.

13.     PayPal often seizes the money permanently after the 180-day hold period ends, without notice and without explanation.

14.     PayPal's User Agreement and AUP cannot be used as a "license to steal."

15.     Most egregious of all, Defendants criminally receive deposits from its customers in the first place.

16.     Plaintiff, proceeding *pro se*, brings this suit against Defendants under the civil remedies provided by RICO and the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFA") to redress the harm Plaintiff has suffered as a direct result of Defendants' conduct.

17.     Plaintiff seeks injunctive, monetary, and declaratory relief against Defendants for engaging in illegal banking, operating an unlicensed money transmitting business, laundering money, and deceptive business practices.

## PARTIES

18.     Plaintiff Vivek Shah is a citizen of the United States and a resident of the State of Illinois. His principal place of residence is 236 Woburn Ln, Schaumburg, IL 60173.

19.     PayPal, Inc. is an American multinational financial technology company operating an online payments system in most countries that support online money transfers and serves as an electronic alternative to traditional paper methods such as checks and money orders. The company operates as a payment processor for online vendors, auction sites and many other commercial users, for which it charges a fee. Its parent company, PayPal Holdings, Inc. ("PayPal Holdings"), is a publicly traded company listed on the NASDAQ. Its headquarters are located at 2211 N 1st St, San Jose, CA 95131 and is registered to do business in Illinois as a foreign corporation with the Secretary of State.

20.     Daniel H. Schulman ("Schulman") is the president and Chief Executive Officer ("CEO") of PayPal and PayPal Holdings. He has held this position since around 2014. He is responsible for managing PayPal's overall operations, including, but not limited to, delegating and directing agendas, driving profitability, managing its organizational structure, strategy, and communicating with the board. His principal place of conducting business is 2211 N 1st St, San Jose, CA 95131.

21.     In acting or omitting to act as alleged herein, PayPal was acting through its employees and/or agents and is liable on the basis of the acts and omissions of its employees and/or agents.

22.     In acting or omitting to act as alleged herein, each employee, officer or agent of PayPal was acting in the course and scope of his or her actual or apparent authority pursuant to such agencies, or the alleged acts or omissions of each employee or officer as agent were subsequently ratified and adopted by PayPal as principal.

## JURISDICTION AND VENUE

23.     This Court has subject-matter jurisdiction over this action under 18 U.S.C. § 1964, 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

24.     This Court has supplemental jurisdiction over the state laws claim in this action under 28 U.S.C. § 1367(a) because it is also related to the federal claims asserted against PayPal so that it forms part of the same case or controversy under Article III of the U.S. Constitution.

25.     This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Fed. Rules of Civ. P.

26.     Venue is proper in this district under to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because Defendants are subject to personal jurisdiction in this judicial district and the Defendants conduct substantial business in this district. PayPal is registered as a foreign corporation to do business in the State of Illinois. Schulman has agents through which he conducts his business affairs in this district. Plaintiff is a resident of Schaumburg, IL.

## FACTUAL BACKGROUND

### I.  PayPal's Relevant Products and Business Model

27.     More than 300 million people and businesses worldwide use PayPal to send money, receive money and shop online. Along with digital payments, PayPal offers other financial services like debit cards, prepaid cards, credit cards and lines of credit.

28.     PayPal's platform is comprised of payment solutions, including core PayPal, PayPal Credit, Braintree, Venmo, Xoom, iZettle, and Hyperwallet. It generates revenue through charging fees on payment transactions it completes for its customers, investing the deposits it receives from its customers, and through other services.

29.     PayPal charges net transaction fees to merchants and consumers for each transaction completed on its payments platform. The magnitude of the fee is based on the volume of activity. Fees are also charged on currency conversions, cross-border transactions, fund transfers from customers' PayPal or Venmo accounts to their debit cards or bank accounts, and other miscellaneous fees.

30.     PayPal generates revenues through partnerships, referral fees, subscription fees, gateway fees, and services offered to merchants and consumers. It also earns interest and fees on its portfolio of loan receivables, as well as interest on certain assets underlying customer balances.

31.     PayPal can be directly connected to the user's bank or credit card account from which money is then retrieved or transferred.

32.     PayPal Business Debit Mastercard. PayPal account holders may apply for a PayPal Business Debit Mastercard ("Business Debit Card"), which works like a debit card, but instead of drawing from a bank account, it draws from the cash balance in the user's PayPal

account. This allows account holders to spend funds that are in their PayPal account without being required to transfer them from their bank account first.

33.     The Business Debit Card offers overdraw protection if users have insufficient funds in their PayPal account and have designated a backup payment source for their card. Backup funding sources can include a confirmed bank account, among others.

34.     To be considered for a PayPal Business Debit Mastercard, a customer must have a PayPal Business or PayPal Balance account to maintain and use a PayPal balance.

35.     According to the PayPal Business Debit Mastercard Cardholder Agreement, a "'PayPal Account' means your account in which you hold or store value and from which you access for use via the Debit Card and is the record we maintain to account for the value of claims associated with the Debit Card."[2]

36.     According to PayPal's own marketing video, the Business Debit Card offers its users 1% cash back, which is "deposited weekly into [the user's] PayPal balance."[3]

37.     PayPal Balance Account. A balance or a Balance Account is much like a bank balance. It is a place where account holders store money. Account holders can deposit and withdraw money from it. Opening a Balance Account allows users to hold a balance, and use the balance to send and receive money, buy things online using mobile devices or in stores, and make payments, among other benefits. Users can only open a Balance Account if they have a personal PayPal account in good standing and can only use a Balance Account by accessing it through their personal PayPal account.

38.     Money held in a Balance Account represents an unsecured claim against PayPal and is not insured by the Federal Deposit Insurance Corporation ("FDIC").

---

[2] https://www.paypal.com/us/webapps/mpp/ua/debitcard-full
[3] https://www.youtube.com/watch?v=TxdhvV0Mu8M

39.    The available features of a Balance Account include:

    a.   Receive money;

    b.   Hold money;

    c.   Convert money from one currency to another;

    d.   Withdraw money from a Balance Account to a debit card or bank account linked to a personal PayPal account;

    e.   Transfer money for purchases of goods and services;

    f.   Send money to friends and family;

    g.   Buy, sell, and hold certain cryptocurrencies if eligible;

    h.   Make in-store purchases using a PayPal-branded debit card linked to a Balance Account;

    i.   Add or withdraw money at ATMs using a PayPal-branded debit card;

    j.   Transfer money to and withdraw money from PayPal Savings;

    k.   Set up Direct Deposit of funds into a Balance Account;

    l.   Load cash into and withdraw funds from a Balance Account at several retail stores throughout the U.S.; and

    m.   Transfer proceeds from checks into a Balance Account using its remote check capture feature.

40.    Users may transfer money into their Balance Account from any bank account linked to their personal PayPal account by requesting an electronic transfer from their bank account.

41.    Users can load funds into their Balance Account at retail stores or they can load funds into it using the remote check capture feature.

42.     Users may arrange to have all or part of their paycheck or any federal or state government benefit or payment (e.g., Federal tax refunds or Social Security payment) transferred directly into their Balance Account by their employer or government payer, as applicable, by using the Direct Deposit feature. Funds added to users' accounts via Direct Deposit are transferred to and held by Wells Fargo Bank, N.A. ("Wells Fargo") where they are eligible for FDIC pass-through insurance.

43.     Any balance in a Balance Account represents an unsecured claim against PayPal.

44.     If a Balance Account is eligible for FDIC pass-through insurance, PayPal holds these funds as the agent and custodian and is the ultimate beneficial owner of the funds. PayPal deposits funds into one or more custodial accounts it maintains for the benefit of eligible Balance Account holders at one or more FDIC-insured banks (currently Wells Fargo). PayPal customer funds in these custodial accounts are eligible for pass-through FDIC insurance coverage.

45.     If a Balance Account is not eligible for FDIC pass-through insurance, PayPal combines the Balance Account balance with the balances of other Balance Account holders and invests those funds in liquid investments in accordance with state money transmitter laws. PayPal owns the interest or other earnings on these investments. However, the claim against PayPal represented by the balance held in the Balance Account is not secured by these investments and customers do not have any ownership interest (either legal or beneficial) in these investments. These pooled amounts are held apart from PayPal's corporate funds, and PayPal neither uses these funds for its operating expenses or any other corporate purposes nor does it voluntarily make these funds available to its creditors in the event of bankruptcy.

46.     As security for the performance of customers' obligations under PayPal's User Agreement, customers are required to grant PayPal a lien on, and security interest in and to, funds held in their PayPal account.

47.     PayPal offers two different Balance Account types: personal PayPal accounts for personal use and PayPal business accounts for business use.

48.     <u>Personal PayPal Accounts</u>. Money sent to a personal PayPal account cannot be held as a balance in a personal PayPal account. A user must open a Balance Account to hold the money as a balance in their Balance Account for purchases or to transfer funds to friends and family members. A Balance Account is separate account from a personal PayPal account. If a user opens a Balance Account, PayPal automatically links the Balance Account to the personal PayPal account.

49.     In or around March 2019, PayPal introduced PayPal Cash ("Cash") and PayPal Cash Plus ("Cash Plus") accounts for personal PayPal users. These accounts are designed as a place within PayPal where users can store money. PayPal automatically opened a Cash account for all active accounts created before March 2019. Cash and Cash Plus accounts are Balance Accounts.

50.     PayPal Cash Card ("Cash Card") is a contactless debit Mastercard that connects to users' PayPal balance so that they could make purchases and withdraw/load cash from their linked account. A PayPal Cash Plus account is required in order to get the card.

51.     The Cash Card lets users use their PayPal balance to spend money online or in stores, wherever Mastercard is accepted, just like a bank account with a debit card. Users can also use this card to withdraw cash, fee-free, at more than 33,000 MoneyPass ATMs worldwide.

52.     Any Personal user can change their account type to a Business Account and vice versa.

53.     <u>PayPal Business Account</u>**.** A PayPal Business Account is an account that includes most of the features of the personal PayPal account, and additionally lets users accept payments and gives them access to eCommerce and Point of Sale ("POS") integrations, online invoicing, a virtual terminal, recurring billing, and more.

54.     Money sent to a PayPal Business Account can be held directly as balance in the PayPal Business Account.

55.     Any balance held in a PayPal Business Account represents an unsecured claim against PayPal and is not insured by the Federal Deposit Insurance Corporation (FDIC).

56.     <u>PayPal Savings</u> is a deposit account provided by Synchrony Bank in which users can deposit funds and subsequently access those funds by transferring them to a Balance Account. A PayPal Balance Account is required to set up and utilize PayPal Savings. All deposits to and withdrawals from PayPal Savings are made via transfer to a Balance Account.

57.     <u>PayPal Working Capital</u> is a business loan with one fixed fee, which is then repaid using a percentage of the business's future PayPal sales. Repayments continue in this way until the amount borrowed, plus the fee, is paid off in full. There are no interest rates or early repayment fees.

58.     <u>PayPal Business Loan</u> provides businesses capital to grow by borrowing anywhere from $5,000 to $500,000.

59.     <u>PayPal Credit</u>, in partnership with Synchrony Bank, offers education financing to students attending more than 150 career-training schools.

II.     **Venmo**

60.     Apart from PayPal's core business as stated in the preceding paragraphs, PayPal also owns and operates a separate business and product known as "Venmo."

61.     Venmo was aimed at friends and family who wish to split bills, e.g. for movies, dinner, rent, or event tickets. Account holders can transfer funds to others via a mobile phone app; both the sender and receiver must live in the United States. Venmo handled $159 billion in transactions in the first quarter of 2018.

62.     Users can create an account via Venmo's mobile app or website and provide basic information and bank account information. One must have a valid email address and an American mobile phone number to use Venmo. Recipients of transactions can be found via phone number, Venmo username, or email.

63.     Users have a Venmo balance that is used for their transactions. They can link their bank accounts, debit cards, or credit cards, to their Venmo account. If a user does not have enough funds in the account when making a transaction, it will automatically withdraw the necessary funds from the registered bank account or card.

64.     Venmo users add funds to their accounts for storage and safekeeping.

III.    **PayPal's Relevant Conduct Leading to the Instant Suit**

65.     In or around 2005, Plaintiff opened a PayPal Personal account.[4]

66.     In or around 2006, Plaintiff upgraded his personal account to a Balance Account.[5] Plaintiff was also approved for a Business Debit Card.[6]

67.     In or around 2016 the Business Debit Card expired.

---

[4] Or a similar product offering with a different product name at the time.
[5] Or a similar product offering with a different product name at the time.
[6] Or a similar product offering with a different product name at the time.

68.     In or around January 2019, Plaintiff started working as a driver for Uber and Lyft in the Chicago metropolitan area.

69.     On or around April 4, 2019, the balance in the account was automatically converted to a PayPal Cash Plus account and was linked to the personal PayPal account.

70.     On or around May 14, 2019, Plaintiff was issued a PayPal Cash Card.

71.     On or around May 14, 2019, Plaintiff requested the PayPal Cash Card to be closed and that a PayPal Business Debit Mastercard be issued.

72.     On or around May 14, 2019, Plaintiff was approved for a PayPal Business Debit Mastercard. The PayPal Cash Card was closed.

73.     On December 23, 2019, Plaintiff sold an item on eBay. The buyer of the item paid a total of $109.15 for the item to Plaintiff by means of PayPal.

74.     In or around January 2020, Plaintiff rented an apartment in Los Angeles, CA to restart his career as an actor. He signed contracts with a theatrical agency for representation for film and television work, a commercial agency for commercial work, and a manager to oversee his career as an actor.

75.     On January 28, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on January 31, 2020.

76.     On January 31, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 5, 2020.

77.     On January 31, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 5, 2020.

78.     On January 31, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 5, 2020.

79.     On January 31, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 5, 2020.

80.     On January 31, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 5, 2020.

81.     On January 31, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 6, 2020.

82.     On February 3, 2020, Plaintiff requested PayPal to transfer $200.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 7, 2020.

83.     On February 3, 2020, Plaintiff requested PayPal to transfer $500.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 7, 2020.

84.     On February 3, 2020, Plaintiff requested PayPal to transfer $500.00 to his Balance Account from his personal bank account. These funds were successfully transferred and posted to the Balance Account on February 7, 2020.

85.     On February 4, 2020, without any prior notice to Plaintiff, PayPal permanently limited his account and froze all funds, totaling $3,332.86.

86.     On February 4, 2020, Plaintiff contacted PayPal's customer service to inquire about the limitation. The PayPal customer service stated that she did not have any information as to why the account was limited, other than a violation of the AUP. Plaintiff pressed the customer service representative further by asking what specifically in the AUP was violated to which the representative responded that she did not have that type of information. Plaintiff then asked her who would have that information, to which she stated that their legal department might. Plaintiff was also notified that his funds will be frozen for up to 180 days.

87.     On or around February 9, 2020 Plaintiff again contacted PayPal's customer service to inquire about the limitation, to which he received the same responses as stated above.

88.     On February 10, 2020 Plaintiff sent a Demand Letter to PayPal's Legal Department requesting more information as to restore full access to his account.

89.     On February 15, 2020, Plaintiff received a response to his Demand Letter through Customer Service, stating that the AUP had been violated, without providing any details about which particular section(s) or subsection(s), and which transactions(s) in the account were to be deemed a violation of the AUP. Plaintiff responded to this response with the reply of yet again asking for the particulars of the AUP violation and transaction(s) involved.

90.     On February 21, 2020, due his inability to meet his daily financial needs, Plaintiff filed a suit against PayPal in the Superior Court of the State of California, for the County of Los Angeles, Case No. 20STLC01718.

91.     On March 24, 2020, due to the global pandemic shutting down nearly all demand for Uber and Lyft rides, and having no other source of income, Plaintiff was forced to leave the State of California and relocated to Illinois to live with his parents. Had Plaintiff had access to his life savings that he had kept in his PayPal account, he would have utilized the money to pay for rent, food, and other basic necessities until he found another source of income or filed for unemployment. PayPal's withholding of $3,332.86 accounted for over 90% of Plaintiff's liquid assets.

92.     In or around April 2020, Plaintiff sent an electronic message to PayPal's Customer Service through its online messaging portal, informing PayPal that due to the global pandemic he was being dislocated since nearly all of his liquid money that he possessed was being held by PayPal. Plaintiff plead to PayPal's customer service to return him his life savings. No response was ever provided by PayPal.

93.     On August 2, 2020, after 180 days of withholding funds, PayPal transferred Plaintiff's funds totaling $3,332.86 to his linked bank account.

94.     On December 23, 2021, Plaintiff requested dismissal of Case No. 20STLC01718, primarily due the extremely congested dockets in California state courts. Additionally, PayPal had failed to appear. The dismissal was entered as requested on January 5, 2022.

95.     From in or around 2005 to 2020, Plaintiff engaged in thousands of transactions for various products offered by PayPal, including its check cashing services, depositing and withdrawing thousands of dollars.

96.     At all relevant times, Plaintiff kept his money in his PayPal account for safekeeping and as a primary means to store money and pay for his daily expenses.

97.     Upon information and belief, PayPal regularly engages in the practice of holding funds of its customers for up to 180 days. See, e.g., "PayPal stole my money for 180 days then confiscated when 180 days were up,"[7] "180 days hold!!,"[8] and "PAYPAL IS HOLDING MY $53,832.05 HOSTAGE FOR 180 DAYS."[9]

## IV.     Facts Common to All RICO Claims

98.     Defendant Schulman is a "person" as that term is defined in 18 USC § 1961(3) because he is an individual capable of holding a legal or beneficial interest in property.

99.     PayPal is an "enterprise" as that term is defined in 18 USC § 1961(4) because it is a corporation.

100.     The predicate acts stated herein all occurred after the effective date of RICO and more than two such acts occurred within ten years of one another.

101.     The enterprise alleged herein also engaged in legitimate business activities beyond those necessary to carry out the alleged acts of racketeering.

102.     Since August 2000, PayPal has processed all of its deposits through Wells Fargo. Wells Fargo also provides other services to PayPal, including wire transfers, check printing, mailing and reconciling as well as fraud protection. Under the terms of their contract governing their relationship, neither party has given the other exclusivity in terms of services. In general, PayPal pays a transaction fee for each ACH and check transaction processed by Wells Fargo.

---

[7] https://www.paypal-community.com/t5/Security-and-Fraud/PayPal-stole-my-money-for-180-days-then-confiscated-when-180/m-p/2714487
[8] https://www.paypal-community.com/t5/Security-and-Fraud/180-days-hold/td-p/1530288
[9] https://www.paypal-community.com/t5/Disputes-and-Limitations/PAYPAL-IS-HOLDING-MY-53-832-05-HOSTAGE-FOR-180-DAYS/td-p/2512969

Pricing is schedule-based, depending on several factors, including domestic or international location, the total volume of payments and other factors.

103.    Upon information and belief, PayPal stores all of its customers' Balance Account funds into an account at Wells Fargo and maintains accounts and can move the funds to custodial accounts at other such federal or state-chartered banks unknown to Plaintiff but chosen by PayPal at any time and without notice.

### *Non-Party Co-Conspirators*

104.    Aaron Karczmer is an Executive Vice President of PayPal's Risk, Platforms and Legal organization. In this role, Karczmer oversees a diverse set of business areas, including control functions, front-line risk and operations teams, and core platforms and services. Control functions include the Chief Risk and Compliance Officer's organization, the General Counsel's organization, and the Corporate Secretary's organization. Front-line teams have global operational and policy responsibility for managing fraud, brand and seller risk, and collections. Front-line teams are also responsible for fulfilling PayPal's commitment to combat money laundering, terrorism financing, and human trafficking. Core platforms and services teams are responsible for company-wide platform capabilities and developing early-stage business units, as well as the service externalization engine for PayPal through Platform-as-a-Service offerings.

105.    Peggy Alford is an Executive Vice President of Global Sales at PayPal. Alford oversees the global sales and distribution of PayPal's products and services and leads the Customer Success and Go-to-Market teams that help drive PayPal's position as a leading digital payment method for consumers and businesses around the globe.

106.    John Rainey is Chief Financial Officer and EVP, Global Customer Operations of PayPal. In his role as CFO, Rainey oversees financial stability and growth at PayPal, which

includes leading PayPal's financial operations, corporate accounting, treasury, financial planning and analysis, investor relations, internal audit, tax, real estate, and sourcing. He is also responsible for leading the company's Global Customer Operations team and guiding PayPal's efforts to deliver on its promise of offering great services and experiences through its customer service centers around the world. This includes leading the Global Customer Services, Decisions and Analytics Management functions, as well as the Global Internal Controls & Complaints Center of Excellence.

107.    David Marcus was formerly the president of PayPal from in or around 2012 to 2014.

108.    Scott Thompson was formerly the president of PayPal from in or around 2008 to 2012.

109.    Does 1-1000 are unnamed non-party co-conspirators of Schulman whose involvement and culpability will be determined through discovery, all of whom are natural persons and either a director, officer, employee, or agent of PayPal.

110.    PayPal is not a co-conspirator; it is the enterprise.

### *The Underlying Criminal Offense - 12 U.S.C.§ 378(a)(2) (Illegal Banking)*

111.    To engage in a banking business in the United States, a bank is required to receive a charter from the United States or the state in which the bank operates. Chartered banks are subject to oversight, regulation and periodic review by federal and state authorities. PayPal has not received a charter to operate as a bank from the United States or the State of Illinois or any other state or territory of the United States.

112.    From in or around 2002 to present, millions ill-informed PayPal users added billions of dollars to their PayPal Balance Account and Venmo accounts, in yet billions of distinct transactions.

113.    PayPal falsely represents to consumers in its User Agreement and elsewhere that: "PayPal is not a bank and does not itself take deposits."[10] Statements such as these are contrary to the realities of how PayPal actually conducts its business.

114.    PayPal and Venmo users place their funds with these companies for safekeeping, which are controlled by the depositors themselves such that they are repayable on demand or at a fixed time. In other words, the money is placed in the custody of these companies, to be withdrawn at the will of the depositor.

115.    Users of PayPal and those closely or even remotely familiar with PayPal know PayPal to be accepting deposits, as the term is used in common parlance. According to a June 29, 2021, press release issued by the United States Department of Justice, "On October 19, 2020, Carter's bank returned the funds to PayPal, which deposited the funds into a second PayPal account belonging to Carter[.]"[11] Upon information and believe, according to Brittney Matthews, a former employee of PayPal, "The PayPal Balance is much like a bank balance. It's a place you store money. You can deposit and withdraw to it." Upon information and believe, according to Joel Yarbrough, another former employee of PayPal, "PayPal Balance is literally that - funds on deposit that are stored with PayPal."

116.    From in or around 2005 to 2020, Plaintiff has made at least one hundred different transactions constituting deposits in his PayPal Balance Account.

---

[10] https://www.paypal.com/us/webapps/mpp/ua/useragreement-full
[11] https://www.justice.gov/usao-md/pr/former-fema-employee-pleads-guilty-fraudulently-obtaining-proceeds-covid-19-paycheck

117.     PayPal and Venmo have neither been authorized to engage in the business of receiving deposits from their customers by the laws of the United States or the State of Illinois, nor are they subjected to examination and regulation by the laws of the United States or the State of Illinois.

118.     PayPal and Venmo have neither been permitted by the United States or the State of Illinois to engage in the business of receiving deposits from their customers, nor are they subjected by the laws of the United States or the State of Illinois to examination and regulations.

119.     PayPal and Venmo: 1) Do not submit to periodic examination by the Illinois Department of Financial and Professional Regulation ("IDFPR")'s Division of Banking ("DOB"), 2) Do not make and publish periodic reports of their condition that would exhibit in detail their resources and liabilities, that are would otherwise be required to be made and published at the same times and in the same manner and under the same conditions as required by the laws of the State of Illinois in the case of incorporated banking institutions engaged in such business in Illinois.

120.     From in or around 2002 to present, in the State of Illinois, and elsewhere, PayPal and Venmo did knowingly and willfully engage , to any extent whatever with others than its officers, agents and employees, in the business of receiving deposits subject to repayment upon evidence of debt, and upon request of the depositor, and PayPal and Venmo (A) were not incorporated under, and authorized to engage in such business, by the laws of the United States and the State of Illinois, and subjected, by the laws of the United States and State of Illinois, to examination and regulation, and (B) were not permitted by the United States and the State of Illinois to engage in such business and subjected by the laws of the United States and State of Illinois to examination and regulations, and (C) did not submit to periodic examination by the

21

banking authority of the State of Illinois where such business was carried on and did not make and publish periodic reports of PayPal and Venmo's condition, exhibiting in detail their resources and liabilities.

121.     In violation of Title 12, United States Code, Sections 378(a)(2) & (b), and Title 18 United States Code, Section 2.

### *Predicate Acts "A:" 18 U.S.C. § 1960(a) (Unlicensed Money Transmitting Business)*

122.     Each, PayPal and Venmo, is an "unlicensed money transmitting business" as that term is defined in 18 U.S.C. § 1960(b)(1)(C) & (b)(2) because each of them is a money transmitting business which affects interstate and foreign commerce and involve the transmission of funds that are known to Schulman to have been derived from a criminal offense, i.e., 12 U.S.C.§ 378(a)(2) (Illegal Banking), and each transfers funds on behalf of the public by various means, including wire, within and outside the United States.

123.     From in or around 2002 to present, Defendant Schulman and his non-party co-conspirators, in Illinois and elsewhere, did knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business, that is, a money transmitting business which affected interstate and foreign commerce and involved the transmission of funds that were known to them to have been derived from a criminal offense, i.e., 12 U.S.C.§ 378(a)(2) (Illegal Banking).

124.     In violation of Title 18, United States Code, Section 1960(a).

125.     The unlicensed money transmitting businesses engaged in the transmission of billions, possibly trillions, of dollars, involving billions of transactions conducted by its millions of customers within and outside the United States, each such transaction constituting an act of

"racketeering activity" as that term is defined in 18 U.S.C. § 1961(1)(B), to wit, section 1960 (relating to illegal money transmitters).

### Predicate Acts "B:" 18 U.S.C. § 1956(c)(3)(A) (Laundering of Monetary Instruments)

126.    "[T]he term 'specified unlawful activity' means… any act or activity constituting an offense listed in section 1961(1) of" Title 18. 18 USC § 1956(c)(7) (Defining "racketeering activity"). 18 U.S.C. § 1960(a) (Unlicensed Money Transmitting Business) is an enumerated offense of § 1961(1). Therefore, a violation of § 1960(a) is a "specified unlawful activity" within the meaning of 18 USC § 1956(c)(7).

127.    Defendant Schulman and his non-party co-conspirators conducted and attempted to conduct "financial transactions" as that term is defined in 18 USC § 1956(c)(4) because the transactions affect interstate or foreign commerce, involve the movement of funds by wire and other means and involve one or more monetary instruments, and the transactions involve the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce.

128.    PayPal used the deposits made by its customers to invest the funds for earning interest and other such gains. It then used these funds for its marketing efforts to lure more potential customers into depositing funds.

129.    For the year 2021 alone, PayPal spent nearly 2.5 billion dollars in sales and marketing costs.[12]

---

[12] https://investor.pypl.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=15529574

Case: 1:22-cv-00795 Document #: 6 Filed: 02/15/22 Page 24 of 30 PageID #:63


130.    Defendant Schulman and his non-party co-conspirators used the proceeds of the unlicensed money transmitting business for the promotion and continuation of this endless scheme.

131.    From in or around 2002 to present, Defendant Schulman and his non-party co-conspirators, in Illinois and elsewhere, did with the intent to promote the carrying on of specified unlawful activity, conduct and attempted to conduct financial transactions involving property used to conduct or facilitate specified unlawful activity.

132.    Each of the billions of financial transactions constitute an independent and separate violation of § 1956(c)(3)(A).

133.    The defendants have violated this statute each time they have received deposits from Plaintiff and other such customers and, on information and belief, have deposited those proceeds in financial institutions, including Well Fargo.

134.    All in violation of Title 18, United States Code, Section 1956(c)(3)(A).

## CAUSES OF ACTION

### COUNT I – Violation of RICO, 18 U.S.C. § 1962(c)

### (Against Schulman only)

135.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

136.    PayPal is an enterprise engaged in and whose activities affect interstate commerce. Defendant Schulman is employed by or associated with the enterprise.

137.    Schulman agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity consisting of operating an

unlicensed money transmitting business and money laundering done for unlawful purposes, including intentionally depriving Plaintiff of his money.

138.     Pursuant to and in furtherance of his unlawful conduct, Schulman committed numerous and related acts of unlawful banking, operating an unlicensed money transmitting business and money laundering, including the use of the interstate wires in connection with the transmission of billions of dollars of funds within and outside the United States.

139.     Schulman engaged in all the predicate acts set forth above, which violate 18 U.S.C. §§ 1960(a) and 1956(c)(3)(A) and are part of a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

140.     The acts set forth above involve open-ended continuity as the term is used in the context of 18 U.S.C. § 1962. Schulman's conduct has been in place for multiple years, has been directed against millions of Americans, including Plaintiff, on a daily basis, and is continuing to date and for the foreseeable future unless checked by this action.

141.     Schulman has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

142.     As a direct and proximate result of Schulman's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff has been injured in his business and property.

143.      All in violation of Title 18, United States Code, Section 1962(c).

## COUNT II – Violation of RICO, 18 U.S.C. § 1962(d)

### (Against Schulman only)

144.     The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

145.     As set forth above, the Defendant Schulman and his non-party co-conspirators agreed and conspired to violate 18 U.S.C. § 1962(c).

146.     Defendant Schulman and his non-party co-conspirators have intentionally conspired and agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

147.     Defendant Schulman and his non-party co-conspirators knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

148.     Defendant Schulman and his non-party co-conspirators committed multiple predicate acts of racketeering in the form of operating an unlicensed money transmitting business and money laundering as described above, in furtherance of the conspiracy. Other co-conspirators have likewise committed predicate acts as described in this Complaint.

149.     Each such predicate act described in the preceding paragraph is also an overt act in furtherance of the conspiracy.

150.     Defendant Schulman and his non-party co-conspirators committed an overt act in furtherance of the conspiracy that has injured Plaintiff and that constitutes a predicate act under the RICO statute.

151.     Defendant Schulman and his non-party co-conspirators agreed to and is a party to the unlicensed money transmitting business and money laundering business, which is a significant component of their unlawful component.

152.     Defendant Schulman and his non-party co-conspirators further agreed to the unlawful conduct as reflected in their numerous conjoined activities, their overlapping and interconnecting leadership, their agreement to continue to engage in the business of receiving

26

deposits, to continue to engage in the unlicensed money transmitting business, and to continue to engage in laundering billions of dollars.

153.    Defendant Schulman and his non-party co-conspirators' conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c).

154.    As a direct and proximate result of Defendant Schulman and his non-party co-conspirators' conspiracy and racketeering activities and violations of 18 U.S.C. § 1962(d), Plaintiff has been injured in his business and property.

155.    All in violation of Title 18, United States Code, Section 1962(d).

**COUNT II – Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS**

**505/2**

**(Against PayPal only)**

156.    The allegations of all the foregoing and following paragraphs are incorporated by reference as if fully set forth in this paragraph.

157.    815 ILCS 505/2 makes it an unfair or deceptive act or practice to engage in any activity that violates the CFA.

158.    Plaintiff meets the CFA definition of "consumer." See 810 ILCS 505/1.

159.    While engaged in trade or commerce, PayPal has committed deceptive acts or practices under the CFA. Throughout the years, PayPal mislead Plaintiff and other consumers, by the means of wire and mail, through which it claimed that it was not receiving deposits.

160.    PayPal used fraud, deception, and misrepresentation in its attempt to persuade consumers, including Plaintiff, that it had the necessary permissions and/or authorizations and/or was otherwise lawfully engaged in the business of receiving deposits.

161.    PayPal intended that Plaintiff and other consumers rely on its deception

162.     The deceptive acts were material.

163.     PayPal's conduct in relation to the withholding of Plaintiff's money was willful, malicious, unfair, and arbitrary.

164.     PayPal's actions are immoral not only because it has perpetrated the fraud complained of in this Complaint against millions of innocent victims in the amounts of billions of dollars for decades, but also because even after Plaintiff informed PayPal that he needed the money due to the global pandemic leaving him almost homeless, it decided instead to not even respond to his plea.

165.     PayPal's actions caused substantial injury to Plaintiff and to consumers generally, as Plaintiff and consumers reasonably expect large financial institutions to comply with the law. In its stead, Plaintiff and consumers generally received false sense of safety and security of their deposits.

166.     The deception imposes harms upon the public and consumers at large.

167.     PayPal used and employed deceptive fraud and false pretenses with the intent that Plaintiff and other consumers rely upon the deception.

## DEMAND FOR JURY TRIAL

168.     Under Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues triable as of right.

## REQUESTED RELIEF

169.     Plaintiff respectfully asks that the Court grant him the following relief:

a.   Enter a declaratory judgment:

       i. Finding that the foregoing actions of PayPal and Schulman violate 12 U.S.C. § 378, 18 U.S.C. §§ 1962(c) & (d), 18 U.S.C. § 1956(a)(3)(A), 18 U.S.C. § 1960(a) and the Illinois Consumer Fraud and Deceptive Business Practices Act.

      ii. Declaring PayPal and Schulman to be unlawfully:

          1. Engaging in the business of receiving deposits;

          2. Operating an unlicensed money transmitting business;

          3. Laundering money; and

          4. Engaging in racketeering activities.

b. Enter a permanent injunction:

       i. Enjoining PayPal, Schulman and their employees, agents, officers, and directors from engaging in the acts of racketeering activity complained of herein; and

      ii. Directing PayPal, Schulman and their employees, agents, officers, and directors to cease operations until it has been chartered as a bank or has otherwise been permitted by the State to engage in such business.

c. Award compensatory damages against each Defendant, jointly and severally, to Plaintiff, in an amount to be determined by the jury that would fully compensate Plaintiff for injuries caused by the conduct of Defendants alleged herein;

d. Award punitive damages, against each Defendant, jointly and severally, to Plaintiff, in an amount to be determined by the jury that would punish Defendants for their willful, wanton, outrageous, malicious, grossly negligent, fraudulent and

reckless conduct alleged herein and that would effectively deter similar conduct in the future;

e.  Award Plaintiff his reasonable attorneys' fees and costs under 18 U.S.C. § 1964(c);

f.  Award prejudgment interest to Plaintiff; and

g.  Order such other relief as this Court deems just and equitable.

Dated: February 14, 2022

Respectfully submitted,

/s/ Vivek Shah
Vivek Shah
236 Woburn Ln
Schaumburg, Il 60173

## **VERIFICATION OF COMPLAINT**

I, Vivek Shah, hereby declare under penalty of perjury that the foregoing facts contained in this Complaint are true and correct to the best of my knowledge.

Executed on February 14, 2022

/s/ Vivek Shah
VIVEK SHAH